UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>VINAY KUMAR NEVATIA,<br><br>Defendant. | Case No. 14-cv-05273-JCS<br><br>**REPORT AND RECOMMENDATION REGARDING SEC'S APPLICATION FOR DEFAULT JUDGMENT**<br><br>Re: Dkt. No. 25 |

## I. INTRODUCTION

This is a civil enforcement action by the Securities and Exchange Commission (the "SEC") against Defendant Vinay Kumar Nevatia ("Kumar").[1] Kumar has not answered the SEC's Complaint otherwise appeared in this action, and the SEC moves for default judgment. According to the SEC's uncontested allegations and evidence, Kumar fraudulently sold approximately $650,000 worth of stock that he did not own, went to great lengths to conceal his misconduct, and left the country rather than cooperate with the SEC's administrative investigation. For the reasons stated below, the undersigned recommends that the SEC's Motion be GRANTED, and that the Court order disgorgement, a civil penalty, and injunctive relief. Although the SEC has consented to the jurisdiction of the undersigned magistrate judge, Kumar has not. Accordingly, this case will be reassigned to a United States district judge for all further proceedings, including action on the recommendations of this Report.

## II. BACKGROUND

### A. Factual Background

Kumar lived in Palo Alto, California "at least from 2004 through 2013," during which time

---

[1] A/k/a Vinay Kumar, Vinay Nevatia, Vinay Nivatia, Vinay K. Kumar, Kumar K., Vinay Kumar Srinivasan, Vinay Srinivasan, and Kumar Mangalam Kumar.

he solicited investments in real estate and securities. Compl. (dkt. 1) ¶ 8.[2] He "is not individually registered with the [SEC] and has never been licensed to trade securities." *Id.*

From approximately May through August of 2008, Kumar convinced eight investors (the "Investors") to purchase shares of CSS Corp. Technologies (Mauritius) Limited ("CSS"), a privately held technology company. *Id.* ¶¶ 10−11. Kumar "told the investors that CSS shares were only available to persons, like himself, with personal connections to the company," and that "it was necessary for the shares to be purchased through a single entity to simplify the transaction for the seller." *Id.* ¶¶ 11−12. He formed a Delaware limited liability company, VRSBS Investment, LLC ("VRSBS"), for the purpose of purchasing the shares. *Id.* ¶¶ 9, 12. Kumar contributed $24,500 to VRSBS, the Investors contributed $874,500, and "Kumar used all of the funds for the purchase of [179,900] CSS shares on behalf of the VRSBS members"—i.e., himself and the eight Investors. *Id.*; Lee Supp'l Decl. (dkt. 35) ¶¶ 3−6 & Ex. A. Kumar was the managing member of VRSBS. Compl. ¶ 14.

The CSS shares were held by VRSBS, but Kumar and the Investors agreed that rights to the shares would be directly proportional to each member's contribution. *Id.* ¶ 13. The "Operating Agreement of VRSBS Investment, LLC," adopted August 8, 2008, provided that VRSBS's "'sole purpose' was to buy and hold CSS shares 'for the benefit of [the VRSBS members],'" that Kumar would notify the investors of the material terms any sale of shares, and that Kumar "was prohibited from commingling the proceeds [of any sale] with his personal accounts." *Id.* ¶ 14 (quoting the Operating Agreement; first alteration in original). At the Investors' request, Kumar procured separate stock certificates from CSS, each representing the number of shares corresponding to an individual Investor's ownership interest. *Id.* ¶ 15. Kumar distributed the physical certificates to each Investor from August 2008 through December 2008, "to ensure that each individual investor would have control over the future sale of his or her shares." *Id.*

---

[2] The factual allegations of the SEC's Complaint are taken as true in the context of a motion for default judgment, except as to damages. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987).

About three years later, in November of 2011, Kumar nevertheless reached an agreement to sell 89,950 CSS shares—constituting half of the VRSBS holdings—to three directors of a San Mateo, California venture capital firm. *Id.* ¶ 16. "In negotiating this sale, Kumar concealed the ownership interests of the original investors and falsely told the directors that the shares were 'his shares.'" *Id.* He also signed a stock purchase agreement falsely representing that the shares were not subject to any encumbrance or restriction, and that he was not a party to any agreement granting any other person rights to the shares. *Id.* ¶ 17. At Kumar's instruction, the directors transferred their $359,800 payment for the stock to "a personal trust bank account held in Kumar's name, rather than to the VRSBS bank account." *Id.* ¶ 18. Kumar never transferred those funds to VRSBS or informed the Investors of the sale. *Id.*

When the directors requested stock certificates for the shares they had purchased, Kumar "falsely claimed that new certificates needed to be issued because all his CSS shares were held on a single certificate, which covered a greater number of shares than the directors had purchased." *Id.* ¶ 19. In February of 2012, two of the directors bought an additional 25,000 CSS shares from Kumar for $100,000 under similar circumstances, again transferring funds to "a bank account under Kumar's sole control," and Kumar again failed to notify the VRSBS Investors of the sale. *Id.* ¶¶ 20−21.

Also in February of 2012, Kumar sold 60,000 CSS shares to a private equity fund for $195,000. *Id.* ¶ 20. The private equity fund transferred the $195,000 to the VRSBS bank account, but Kumar depleted all but $500 of that through nine separate transfers to an account under his own control, culminating on March 1, 2012. *Id.* ¶ 21; Lee Decl. (dkt. 27) ¶ 2 & Ex. 1. Again, Kumar never distributed these funds to the VRSBS Investors or notified them of the sale. Compl. ¶¶ 20−21.

When Kumar sought to finalize the resales by procuring new stock certificates, CSS's transfer agent informed him that he would need to return the original certificates for cancellation. Kumar "falsely told the transfer agent during a phone conversation that all of the original stock certificates issued to VRSBS had been lost," when in fact he had distributed them to the Investors as assurance that the stock would not be sold without their consent. *Id.* ¶ 22. Kumar signed an

1  "Indemnity for Lost Share Certificates" repeating that assertion, and the transfer agent issued new
2  stock certificates to the purchasers in September of 2012 and, "[a]fter an administrative delay,"
3  May of 2013.  *Id.*  All told, Kumar resold 174,950 of VRSBS's 179,900 CSS shares—more than
4  97% of its holdings.  *Id.* ¶¶ 16, 20.

5       From around March of 2012 through July of 2013, Kumar took a number of steps to
6  conceal the resales from the Investors.  *Id.* ¶ 23.  While "he was in the final stages of the
7  fraudulent resale of the shares," he told the original Investors that he would obtain new stock
8  certificates in the Investors' own names (as opposed to in the name of VRSBS).  *Id.*  He also told
9  an Investor that CSS was performing well and planning for "a potentially lucrative public
10 offering," and told two Investors that he would try to find buyers for their shares, despite having
11 already sold the stock.  *Id.*  When CSS announced a dividend, Kumar asked the Investors to
12 provide wire transfer information, even though he had already sold at least some of the stock.  *Id.*
13 When certain Investors confronted Kumar in August of 2013 with evidence they had obtained
14 from CSS regarding the fraudulent sales, "Kumar tried to keep his scheme going by falsely
15 claiming that he had not actually sold the shares, but only temporarily 'transferred' them to
16 safeguard them from Kumar's creditors."  *Id.* ¶ 24.  He also "pretended to restore an original
17 investor's shares through a purported stock transfer from two fictitious shareholders," by sending
18 the Investor "bogus forms purporting to record the transfer of 100,000 shares" from individuals
19 who did not actually own any CSS stock.  *Id.*  Kumar then "stopped responding to all attempts by
20 the VRSBS members to contact him."  *Id.*

21      **B.**    **Procedural History and Communications Between the Parties**

22      During the SEC's investigation of the conduct at issue in this case, SEC attorney William
23 Salzmann spoke to Kumar by telephone, and Kumar informed Salzmann "that e-mail was the best
24 way to send documents to him."  Salzmann Decl. (dkt. 26) ¶¶ 1−2.  In early October, 2013,
25 Salzmann sent Kumar an administrative subpoena to appear for testimony on October 21, 2013,
26 and Salzmann and other SEC staff members later spoke to Kumar by telephone regarding the
27 schedule for his testimony.  *Id.* ¶ 4.  "Mr. Kumar stopped responding to the [SEC]'s calls, e-mails,
28 and other written correspondence on or about October 25, 2013 [and] never appeared for

testimony." *Id.*

The SEC filed its Complaint in this action on December 2, 2014. *See generally* Compl. Two days later, the SEC "sent courtesy copies of the complaint, summons and other documents via e-mail" to Kumar. Salzmann Decl. ¶ 5. The SEC later learned that Kumar was in custody at the Dubai Customs Holding Center in the United Arab Emirates ("UAE") on unrelated charges, and on February 9, 2015, served process on a receptionist authorized to accept service at the Dubai Customs Holding Center. *See generally* Certificate of Service (dkt. 16); Singh Decl. (dkt. 34).

Kumar has not responded to the Complaint or otherwise appeared in this action. At a case management conference on June 19, 2015, the SEC stated its intent to seek default judgment. Civil Minute Order (dkt. 23). On June 22, 2015, the SEC sent Kumar, via email, a courtesy copy of the Minute Order reflecting that intent. Salzmann Decl. ¶ 6. The SEC moved for default judgment on July 17, 2015, *see* Mot. (dkt. 25), and filed a separate Request for Entry of Default (dkt. 30) on July 20, 2015. The Clerk entered default as to Kumar on July 21, 2015. Dkt. 31.

The Complaint includes three claims, all based on substantially the same conduct: the first for violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; the second for violation of paragraph (a)(1) of Section 17 of the Securities Act; and the third for violation of paragraphs (a)(2) and (a)(3) of Section 17 of the Securities Act. The SEC's Motion is supported by: (1) a declaration by William Salzmann describing the SEC's communications with Kumar; (2) a declaration by Jason Lee (dkt. 27) attaching summaries of Kumar's relevant financial activity and the SEC's interest calculations; and (3) a request for judicial notice of UAE law regarding service of process ("RJN," dkt. 28). The SEC seeks disgorgement of profit, prejudgment interest, a civil penalty, and an injunction against further violation of the securities laws.

At the hearing on September 11, 2015, the undersigned identified certain deficiencies in the SEC's submissions, specifically the SEC's failure to take into account the stock that Kumar purchased with his own money and inadequate evidence regarding service. *See* Civil Minute Order (dkt. 33). On October 9, 2015, the SEC filed a declaration by Jaswinder Singh (a process server) addressing the SEC's service of process, and a supplemental declaration by SEC attorney Jason Lee explaining what portion of the CSS stock Kumar purchased with his own money and

recalculating damages to account for that. *See generally* Singh Decl.; Lee Supp'l Decl.

## III.  ANALYSIS

### A.  Preliminary Considerations

#### 1.  Jurisdiction

When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has the affirmative duty to determine whether it has jurisdiction. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). The Court has subject matter jurisdiction over this action because it is an action under federal law, and also because it is brought by an agency of the United States. 28 U.S.C. §§ 1331, 1345. As for personal jurisdiction, Kumar "resided in Palo Alto, California at least from 2004 through 2013," a period encompassing most if not all of the conduct at issue. *See* Compl. ¶ 8. Although he has since relocated to the United Arab Emirates, "one cannot defeat personal jurisdiction by a move away from the state in which the underlying events took place." *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) (citing *Ariz. Barite Co. v. Western-Knapp Eng'g Co.*, 170 F.2d 684 (9th Cir. 1948)). This Court therefore has personal jurisdiction over Kumar.

#### 2.  Adequacy of Service

Courts must determine the adequacy of service of process on a motion for default judgment. *Bank of the West v. RMA Lumber Inc.*, No. 07-6469 JSW, 2008 WL 2474650, at *2 (N.D. Cal. June 17, 2008). Service outside of the United States must be done in accordance with Rule 4(f) of the Federal Rules of Civil Procedure. Where "there is no internationally agreed means" of service,[3] permissible methods of service include any "method reasonably calculated to give notice . . . as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2).

At the time of service, Kumar was incarcerated at the Dubai Customs Holding Center in the UAE. Singh Decl. ¶ 3. UAE law provides for service as follows: "Concerning the prisoners,

---

[3] The UAE is not a signatory to the Hague Convention on Service Abroad. *See* Hague Conference on Private Int'l Law, *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters: Members of the Organisation*, http://www.hcch.net/index_en.php?act=conventions.statusprint&cid=17.

the copy shall be delivered to the administration of the place where they were confined in order to deliver it to them." UAE Fed. Law No. 11 Concerning Civil Procedure art. 9 § 5 (official English translation); RJN at ECF pp. 9, 19.[4]  On February 2, 2015, through a process server, the SEC served process for this case on Laila Alsaadi, a receptionist authorized to accept service on behalf of Ahmed Mehboob Musabih, Director of Dubai Customs. Singh Decl. ¶ 5; Proof of Service (dkt. 16). When the process server delivered the documents, Alsaadi assured him that Kumar would receive them. Singh Decl. ¶ 6. The process server returned the next day and Alsaadi "confirmed that [Kumar] was still in custody at the facility and . . . had received the summons, complaint, and other documents." *Id.* ¶ 7. Taking notice of UAE law, the undersigned finds that service was adequate under Rule 4(f)(2)(A).

### A.   Legal Standard for Entry of Default Judgment

After default has been entered against a party, a district court may grant an application for default judgment in its discretion. *See* Fed. R. Civ. P. 55(b)(2). If the court is satisfied that jurisdiction is proper and that service of process upon the defendant was adequate, it then considers several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471−72 (9th Cir. 1986). In making its decision, the court takes all factual allegations in the complaint, except those relating to damages, as true. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.").

---

[4] Courts are "permitted to take judicial notice of authoritative statements of foreign law." *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 n.10 (9th Cir. 1989). The SEC's request for judicial notice of this provision of UAE law, as stated on the official website of the UAE Ministry of Justice, is therefore GRANTED.

### B. *Eitel* Factors

Several of the *Eitel* factors weigh in favor of granting default judgment simply by virtue of the fact that Kumar has not participated in this action. Because Kumar has failed to respond to the complaint or otherwise appear in this action, the SEC will be left without a remedy, and therefore prejudiced, if default judgment is not granted. The sum of money at stake, while significant, is justified by the evidence proffered by the SEC establishing damages, as discussed further below. Kumar was properly served, and there is no indication that his default is due to excusable neglect. Kumar could conceivably dispute some of the material facts if he were to appear, but he has failed to do so. Finally, while there is a strong public policy favoring the resolution of disputes on the merits, that is not possible in this case because Kumar has failed to appear and there is no indication that he intends to do so.

The remaining factors, "the merits of plaintiff's substantive claim" and "the sufficiency of the complaint," are intertwined where, as here, the case has not advanced beyond the pleading stage. As detailed below, the undersigned finds that these factors also favor granting default judgment as to each of the SEC's claims.

#### 1. Claim Under Section 10(b) and Rule 10b-5

Under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), it is unlawful to use "any means or instrumentality of interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 broadly prohibits the use of (a) "any device, scheme, or artifice to defraud"; (b) "any untrue statement of a material fact" or misleading omission of a material fact; or (c) "any act practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. "Liability under Section 10(b) and Rule 10b-5 therefore requires evidence of (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) with scienter, (4) by means of interstate commerce." *SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855−56 (9th Cir. 2001)). To be liable for a fraudulent scheme under Rule

10b-5 paragraphs (a) or (c), the scheme must "encompass[] conduct beyond . . . misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011).

Taking the allegations of the Complaint as true, *see TeleVideo Sys.*, 826 F.2d at 917−18, Kumar's conduct here meets each of the four elements set forth in *Todd*.

As for the first element, Kumar made numerous material misrepresentations to the original Investors, the subsequent purchasers of the CSS stock, and the CSS transfer agent, including that he owned all of the shares he was selling, Comp. ¶ 16, that the shares were not encumbered and that he was free to sell them, *id.* ¶ 17, that all shares were held on a single stock certificate, *id.* ¶ 19, that the original stock certificates had been lost, *id.* ¶ 22, that the Investors would get new stock certificates in their own names, *id.* ¶ 23, that he would try to find buyers for shares he had in fact already sold, *id.*, that he had merely transferred the shares to protect them from creditors, *id.* ¶ 24, and that two individuals who in fact owned no CSS stock were holding 100,000 of the Investors' shares, *id.* Kumar also made significant material omissions, most notably by failing to inform the Investors that he had sold their stock. *Id.* ¶¶ 18, 20. Kumar's fraudulent conduct also extended beyond misrepresentations or omissions, and thus meets the "fraudulent scheme" standard of paragraphs (a) and (c), because he took concrete steps including reselling the stock without permission and transferring the proceeds of one sale from VRSBS to his own account. *Id.* ¶¶ 16−21; Lee Decl. Ex. 1.

For the second element, the CSS shares plainly constitute "a security," and all of the fraudulent conduct at issue occurred "in connection with the purchase or sale of [that] security." *See Todd*, 642 F.3d at 1215.

The third element, scienter, can be met by showing either "'intent to deceive, manipulate, or defraud,'" *id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)), or "[r]eckless conduct"—i.e., "a highly unreasonable act or omission that is an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it,'" *id.* (quoting *Dain Rauscher*, 254 F.3d at 856). Here, Kumar's repeated efforts to conceal his fraud

demonstrate the requisite intent to support a claim. The most significant example is Kumar's conduct after some of the original Investors learned from CSS that Kumar had sold their stock:

> Even then, Kumar tried to keep the scheme going by falsely claiming that he had not actually sold the shares, but only temporarily 'transferred' them to safeguard them from Kumar's creditors. Later that month, Kumar pretended to restore an original investor's shares through a purported stock transfer from two fictitious shareholders. As proof, Kumar sent the investors bogus forms purporting to record the transfer of 100,000 shares, but, in reality, neither of the two purported transferors owned any CSS shares. At this point, Kumar stopped responding to all attempts by the VRSBS members to contact him.

Compl. ¶ 24. These efforts are not consistent with any explanation except intent to defraud. *See SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) (holding that where a defendant did not use investors' funds in the manner that he said he would, used some funds for his own personal expenses, "ignored investors' inquiries about the status of their funds[,] and provided false accountings," the "circumstances go beyond mere recklessness and indicate a deliberate intent to defraud investors").

The final element requires that the fraudulent scheme occur "by means of interstate commerce." *Todd*, 642 F.3d at 1215. The SEC's present Motion does not address this element, and the Complaint is largely silent as to *how* Kumar communicated with the Investors, the subsequent purchasers, and CSS. *See generally* Mot.; Compl. The Complaint does, however, include a number of allegations that relate to interstate commerce. Kumar formed a Delaware limited liability company, VRSBS, which he operated in California for the purpose of holding CSS shares. Compl. ¶ 9−12. CSS, whose stock Kumar purchased and whose employees he communicated with on a number of occasions, "is a private Mauritius company." *Id.* ¶ 10. Kumar resold a number of CSS shares to "a Cayman Islands private equity firm managed out of Hong Kong." *Id.* ¶ 20. He instructed certain purchasers "by email" to send funds to a bank account that he controlled. *Id.* ¶ 21. He also "falsely told the [CSS] transfer agent *during a phone call* that all of the original stock certificates issued to VRSBS had been lost." *Id.* ¶ 22 (emphasis added). Finally, the scheme involved a number of wire transfers. *See id.* ¶¶ 18, 21. The undersigned is therefore satisfied that the fraudulent scheme here involved "means or instrumentalit[ies] of

1 interstate commerce, or of the mails." *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.

2 Because each of the *Todd* elements is satisfied, the Complaint is sufficient to state a claim
3 for violation of Section 10(b) and Rule 10b-5. Taking the allegations of the Complaint as true,
4 both the "the merits of plaintiff's substantive claim" and "the sufficiency of the complaint" favor
5 granting default judgment on this claim. *See Eitel*, 782 F.2d at 1471−72.

### 2. Claims Under Section 17(a)

Section 17(a) of the Securities Act of 1933 reads as follows:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Paragraph (1) if Section 17(a) requires scienter, but paragraphs (2) and (3) do not. *Aaron v. SEC*, 446 U.S. 680, 701−02 (1980).

For substantially the same reasons discussed above in the context of Section 10(b) and Rule 10b-5, the undersigned finds that the SEC's Complaint states a claim for violation of paragraphs (1) and (3) of Section 17(a). Taking the SEC's allegations as true, Kumar used means or instruments of interstate commerce in the sale of a security to employ a "scheme . . . to defraud" and engage in a "transaction, practice, or course of business which operate[d] . . . as a fraud or deceit upon the purchaser[s]," with respect to both the original Investors (whom he fraudulently convinced that they would maintain control over their portion of the stock) and the subsequent purchasers (whom he fraudulently convinced that he owned the stock that he sold them). With respect to the scienter requirement of paragraph (1), the undersigned finds the allegations sufficient to show that Kumar acted with intent to defraud.

As compared to Section 10(b) and Rule 10b-5(b), Section 17(a)(2) adds the requirement

11

that the defendant "obtain money or property" by means of his material misrepresentation. 15 U.S.C. § 77q(a)(2). The Complaint adequately alleges that Kumar's false representation that he owned the stock resulted in his obtaining money from the purchasers of the stock. Compl. ¶¶ 18, 21; *see also* Lee Decl. ¶ 2 & Ex. 1.

The undersigned finds that the SEC's Complaint adequately states a claim under each paragraph of Section 17(a), and that the "the merits of plaintiff's substantive claim" and "the sufficiency of the complaint" therefore favor granting default judgment on these claims. *See Eitel*, 782 F.2d at 1471−72.

### C. Disgorgement

"The district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (citations omitted). "[A]lthough it is normally within the district court's discretion to order that disgorged funds be used to compensate securities fraud victims, there is no merit in [the] contention that such an order is required." *SEC v. Fischbach Corp.*, 133 F.3d 170, 176 (2d Cir. 1997); *see also First Pac. Bancorp*, 142 F.3d at 1193 (citing *Fischbach* with approval). "The district court [is] not required to trace every dollar of the . . . proceeds," and may properly order disgorgement of "only 'a reasonable approximation of profits causally connected to the violation.'" *First Pac. Bancorp*, 142 F.3d at 1192 n.6 (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)).

The evidence demonstrates that Kumar obtained $654,300 from the resale of CSS stock: $459,800 directly from the venture capital firm directors, and $194,500 that he transferred to his own accounts from the VRSBS account after the private equity fund purchaser paid $195,000 to that account. Lee Decl. ¶ 2 & Ex. 1. Because Kumar had used $24,500 of his own money to purchase the stock, subtracting that amount from the $654,300 he received from the resales yields a total illicit gain of $629,800. The undersigned therefore recommends that Kumar be ordered to disgorge $629,800.

### D. Prejudgment Interest

Awards of prejudgment interest fall within the district court's discretion. *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1099 (9th Cir. 2010). In its administrative proceedings, the SEC has adopted the prejudgment interest rate set forth at 26 U.S.C. § 6621(a)(2), which by its terms governs underpayment of taxes. *See Platforms Wireless*, 617 F.3d at 1099. The Ninth Circuit has "conclude[d] that the SEC's reasoning on this issue is persuasive" and affirmed a district court order applying that rate to disgorgement of profit obtained in violation of the securities laws. *Id.* Section 6621(a)(2) provides for an interest rate equal to "(A) the Federal short-term rate . . . plus (B) 3 percentage points." 26 U.S.C. § 6621(a)(2).

The SEC submits a declaration by Jason Lee indicating that the SEC calculated interest through September 30, 2015 using the method prescribed by § 6621(a)(2), and attaching a worksheet showing quarterly interest calculations. Lee Supp'l Decl. ¶ 8 & Ex. B. The undersigned finds these calculations to be generally correct[5] and recommends that disgorgement include $71,213.94 in prejudgment interest, for a total of $701,013.94.

### E. Civil Penalties

The SEC also asks that the Court impose civil monetary penalties on Kumar pursuant to Section 20 of the Securities Act and Section 21 of the Exchange Act. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3). The purpose of imposing monetary penalties in addition to disgorgement of profits is to punish the violator as well as deter future violations of the securities laws. *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996). With disgorgement alone, absent any mechanism for an additional penalty, "even a violator who is caught is required merely to give back his gains with interest, leaving him no worse off financially than if he had not violated the law." H.R. Rep. No. 101-616 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1379, 1384 (explaining the legislative intent behind the civil penalty statutes).

---

[5] The SEC's calculations appear to compound interest quarterly rather than daily. *See* 26 U.S.C. § 6622(a) (providing that for tax underpayment, interest "shall be compounded daily"). Because any difference resulting from that discrepancy is de minimis and favors Kumar, the undersigned recommends that the Court award the SEC the $71,213.94 in prejudgment interest that it requests.

Congress has established a three-tiered system to guide courts in determining the appropriate amount of civil monetary penalties. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3). A "first-tier" penalty of up to $7,500 for an individual and $75,000 for any other entity may be imposed for each violation of the securities laws, a "second-tier" penalty of up to $75,000 for an individual and $375,000 for any other entity may be imposed for violations of the securities laws that involve fraud or deceit, and a "third-tier" penalty of up to $150,000 for an individual and $725,000 for any other entity may be imposed for violations of the securities laws that involved fraud or deceit and resulted in substantial loss or a significant risk of substantial loss. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3); 17 C.F.R. § 201.1004 & Table IV (adjusting statutory penalties for inflation). A court may alternatively impose a penalty up to "the gross amount of pecuniary gain to [the] defendant as a result of the violation," regardless of the tier. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3). Subject to those maximum limits, the amount of the penalty is left to the discretion of the court, to be determined "in light of the facts and circumstances" of the case. 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i).

The undersigned finds that Kumar's conduct in this case falls within the third tier. As discussed above, Kumar engaged in extensive fraud and deceit directed at three separate groups: the Investors whose stock Kumar sold for his own gain, the resale purchasers who believed Kumar owned the stock he was selling them, and the CSS transfer agent who issued new stock certificates based on Kumar's false representation that he had lost the original certificates. His conduct also resulted in a "substantial loss" to the Investors, because Kumar took for himself the $629,800 he obtained by selling the Investors' shares (after accounting for his own $24,500 investment). In light of Kumar's flagrant deception and misappropriation of funds, his protracted efforts to conceal his wrongdoing, and his apparent flight from the United States to avoid facing liability, the undersigned recommends imposing the maximum civil penalty, equal to Kumar's pecuniary gain of $629,800.[6] *See SEC v. Razmilovic*, 738 F.3d 14, 38−39 (2d Cir. 2013) (affirming a civil

---

[6] The SEC has not addressed whether prejudgment interest on the defendant's initial gain can be included in calculating a civil penalty under §§ 77t(d)(2) and 78u(d)(3). (The SEC did not include such interest in its description of the maximum civil penalty. *See* Mot. at 16−17.) The Court need not address that issue—even if including interest would be permissible, the undersigned finds

14

penalty of over twenty million dollars, equal to half of the defendant's pecuniary gain, where the defendant "was a direct participant in pervasive fraud scheme, . . . fled the country, continues to refuse to admit any wrongdoing, and has never expressed any remorse" (emphasis omitted)).

### F.	Injunctive Relief

Both the Securities Act and the Exchange Act give the Court discretion to enjoin practices that violate those acts where there is a reasonable likelihood of future violations.  15 U.S.C. §§ 77t(b), 78(u)d; *see also SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).  In determining whether there is a likelihood of future violations, courts consider the following factors:

> (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

*Fehn*, 97 F.3d at 1295.

Here, each factor favors granting an injunction.  First, as discussed above, the undersigned finds that Kumar acted with intent to defraud.  Second, although the allegations reflect only one fraudulent scheme, the misconduct at issue is more properly characterized as "recurrent" than "isolated": Kumar's scheme extended over a period of years, he engaged in numerous acts of deception both to perpetrate the fraud and to conceal it after the fact, and he failed to meaningfully cooperate with the SEC's administrative investigation.  Third, Kumar has shown no recognition of wrongful conduct.  Fourth, Kumar solicited investments for a period of approximately five years, placing him in an occupation with a high risk of future violations.[7]  *See* Compl. ¶ 8.  Finally, there is no indication that Kumar has made any assurance against future violations.  The undersigned therefore recommends that the Court grant the SEC's proposed injunction.

### IV.	CONCLUSION

For the reasons stated above, the undersigned recommends that the Court GRANT the

---

$629,800 to be a sufficient penalty to serve the statutes' punitive and deterrent purposes.

[7] Because Kumar's current professional occupation is not clear from the Complaint or the record, this factor does not weigh as strongly as it would if Kumar were currently soliciting investments. In conjunction with the other factors, however, the undersigned finds Kumar's recent work in investments sufficient to support an injunction.

SEC's motion for default judgment, order that Kumar disgorge $701,013.94 of ill-gotten profit (including prejudgment interest of $71,213.94), assess a civil penalty of $629,800, and enjoin Kumar from any further violation of the securities laws.

Given the magnitude of the recommended judgment and its foundation primarily on the unanswered allegations of the SEC's Complaint, the undersigned further recommends that the Court require the SEC to serve a copy of this Report on Kumar. The undersigned recommends that the Court withhold judgment until fourteen days after service to allow Kumar a final opportunity to respond to the SEC's allegations. *See Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1016 (N.D. Cal. 2015) (noting that although 28 U.S.C. § 636(b) includes "no clear requirement" for such service, "the court normally requests that the moving party do so," but in that case would not require further expenditure of resources to complete international service before entering a $25,084 judgment).

Dated: October 19, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge